# FEDERAL TRADE COMMISSION *v.* RALADAM CO.

No. 484.   Argued April 24, 1931.—Decided May 25, 1931.

*Assistant to the Attorney General O'Brian* for petitioner. *Solicitor General Thacher* and *Messrs. Claude R. Branch* and *Charles H. Weston,* Special Assistants to the Attorney General, *Hammond E. Chaffetz, Robert E. Healy,* Chief Counsel, Federal Trade Commission, and *Martin A. Morrison,* Assistant Chief Counsel, were also on the brief.

*Mr. Lewis W. McCandless,* with whom *Messrs. Thomas G. Long* and *Rockwell T. Gust* were on the brief, for respondent.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

Under § 5 of the Federal Trade Commission Act, c. 311, 38 Stat. 717, 719 (U. S. C., Title 15, § 45), the relevant parts of which are copied in the margin,* the Commission issued its complaint charging the respondent with using unfair methods of competition in interstate commerce.

Respondent manufactures a preparation for internal use, denominated an " obesity cure." The complaint charges that this preparation is sold by respondent in and throughout the several States, generally to wholesalers who resell to retailer dealers, and these, in turn, to consumers; that it is offered for sale and sold in competition with other persons who are engaged " in offering for sale,

---

* That unfair methods of competition in commerce are hereby declared unlawful.

The commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, and common carriers subject to the Acts to regulate commerce, from using unfair methods of competition in commerce.

Whenever the commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition in commerce, and if it shall appear to the commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect, and containing a notice of a hearing upon a day and at a

and selling, printed professional advice, books of information and instruction, and other methods and means and certain remedies and appliances for dissolving or otherwise removing excess flesh of the human body "; that respondent advertises in newspapers, etc., circulated generally in the United States, and in printed labels, etc., that the preparation is the result of scientific research, knowledge and accuracy, that it is safe and effective and may be used without discomfort, inconvenience or danger of harmful results to health. Among the ingredients is " desiccated thyroid," which, it is alleged, cannot be prescribed to act with reasonable uniformity on the bodies of all users, or without impairing the health of a substantial portion of them, etc., or with safety, without previous consultation with, and continuing observation and advice of, a competent medical adviser. The complaint further avers that many persons are seeking obesity remedies, and respondent's advertisements are calculated to mislead and deceive the purchasing public into the belief that the preparation is safe, effective, dependable, and without danger of harmful results. By way of conclusion, it is said that " the acts and practices of the respondent are all to the prejudice of the public and of competitors of respondent, . . . and constitute unfair methods of competition."

---

place therein fixed at least thirty days after the service of said complaint. The person, partnership, or corporation so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the commission requiring such person, partnership, or corporation to cease and desist from the violation of the law so charged in said complaint. . . . If upon such hearing the commission shall be of the opinion that the method of competition in question is prohibited by this Act, it shall make a report in writing in which it shall state its findings as to the facts, and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition.

.Respondent answered and hearings were had before an examiner. The Commission found against respondent and issued a cease and desist order. The findings in general follow the language of the complaint. There was no finding of prejudice or injury to any competitor, but the conclusion was drawn from the findings of fact that the practice of respondent was to the prejudice of the public and respondent's competitors, and constituted an unfair method of competition.

The court of appeals reviewed the action of the Commission upon respondent's petition, and reversed the order. 42 F. (2d) 430. We brought the case here by certiorari, limiting the briefs and argument to the question of the jurisdiction of the Commission.

In substance the Commission ordered the respondent to cease and desist from representing that its preparation is a scientific method for treating obesity, is the result of scientific research, or that the formula is a scientific formula; and from representing its preparation as a remedy for obesity, unless accompanied by the statement that it cannot be taken safely except under medical advice and direction. Findings, supported by evidence, warrant the conclusion that the preparation is one which cannot be used generally with safety to physical health except under medical direction and advice. If the necessity of protecting the public against dangerously misleading advertisements of a remedy sold in interstate commerce were all that is necessary to give the Commission jurisdiction, the order could not successfully be assailed. But this is not all.

By the plain words of the act, the power of the Commission to take steps looking to the issue of an order to desist depends upon the existence of three distinct prerequisites: (1) that the methods complained of are *unfair;* (2) that they are methods of *competition* in commerce; and (3) that a proceeding by the Commission to

prevent the use of the methods appears to be in the *interest of the public.* We assume the existence of the first and third of these requisites; and pass at once to the consideration of the second.

Section 5 of the Trade Commission Act is supplementary to the Sherman Anti-Trust Act and the Clayton Act. *Federal Trade Comm.* v. *Beech-Nut Co.,* 257 U. S. 441, 453. The latter was discussed and passed at the same session of Congress. The Sherman Act deals with contracts, agreements and combinations which tend to the prejudice of the public by the undue restriction of competition or the undue obstruction of the due course of trade, *United States* v. *American Tobacco Co.,* 221 U. S. 106, 179; and which tend to "restrict the common liberty to engage therein." *United States* v. *Patten,* 226 U. S. 525, 541.

The Clayton Act, so far as it deals with the subject, was intended to reach in their incipiency agreements embraced within the sphere of the Sherman Act. *Standard Fashion Co.* v. *Magrane-Houston Co.,* 258 U. S. 346, 355–357. The object of the Trade Commission Act was to stop in their incipiency those methods of competition which fall within the meaning of the word "unfair." "The great purpose of both statutes was to advance the public interest by securing fair opportunity for the play of the contending forces ordinarily engendered by an honest desire for gain." *Federal Trade Comm.* v. *Sinclair Co.,* 261 U. S. 463, 476. All three statutes seek to protect the public from abuses arising in the course of competitive interstate and foreign trade. In a case arising under the Trade Commission Act, the fundamental questions are, whether the methods complained of are "unfair," and whether, as in cases under the Sherman Act, they tend to the substantial injury of the public by restricting competition in interstate trade and "the common liberty to engage therein." The paramount aim of the act is the

protection of the public from the evils likely to result from the destruction of competition or the restriction of it in a substantial degree, and this presupposes the existence of some substantial competition to be affected, since the public is not concerned in the maintenance of competition which itself is without real substance. Compare *International Shoe Co.* v. *Federal Trade Comm.*, 280 U. S. 291, 297–299.

The bill which was the foundation of the Act, as it first passed the Senate, declared "unfair competition" to be unlawful. Debate apparently convinced the sponsors of the legislation that these words, which had a well settled meaning at common law, were too narrow. When the bill came from conference between the two Houses, these words had been eliminated and the words "unfair methods of competition" substituted. Undoubtedly the substituted phrase has a broader meaning but how much broader has not been determined. It belongs to that class of phrases which do not admit of precise definition, but the meaning and application of which must be arrived at by what this court elsewhere has called "the gradual process of judicial inclusion and exclusion." *Davidson* v. *New Orleans*, 96 U. S. 97, 104. The question is one for the final determination of the courts and not of the Commission. *Federal Trade Comm.* v. *Gratz*, 253 U. S. 421, 427; *Federal Trade Comm.* v. *Beech-Nut Co., supra*, p. 453.

The authority of the Commission to proceed, if that body believes that there has been or is being used any unfair method of competition in commerce, was then qualified in conference by the further requirement, not in the original bill,—" and if it shall appear to the commission that a proceeding by it in respect thereof would be to the interest of the public." By these additional words, protection to the public interest is made of paramount importance, but, nevertheless, they are not sub-

stantive words of jurisdiction, but complementary words
of limitation upon the jurisdiction conferred by the lan-
guage immediately preceding. Thus, the Commission is
called upon first to determine, as a necessary prerequisite
to the issue of a complaint, whether there is reason to
believe that a given person, partnership or corporation
has been or is using any unfair method of competition in
commerce; and that being determined in the affirmative,
the Commission still may not proceed unless it further
appear that a proceeding would be to the interest of the
public, and that such interest is specific and substantial.
*Federal Trade Comm.* v. *Klesner,* 280 U. S. 19, 28. Un-
fair trade methods are not *per se* unfair methods of
*competition.*

It is obvious that the word " competition " imports the
existence of present or potential competitors, and the un-
fair methods must be such as injuriously affect or tend
thus to affect the business of these competitors—that is to
say, the trader whose methods are assailed as unfair must
have present or potential rivals in trade whose business
will be, or is likely to be, lessened or otherwise injured.
It is that condition of affairs which the Commission is
given power to correct, and it is against that condition of
affairs, and not some other, that the Commission is au-
thorized to protect the public. Official powers cannot be
extended beyond the terms and necessary implications of
the grant. If broader powers be desirable they must be
conferred by Congress. They cannot be merely assumed
by administrative officers; nor can they be created by the
courts in the proper exercise of their judicial functions.

The foregoing view of the powers of the Commission
under the Act finds confirmation, if that be needed, in
the committee reports and the statements of those in
charge of the legislation, as well as in the debate which
took place in the Senate, extending over weeks of time and
covering hundreds of pages in the Congressional Record.

In that debate the necessity of curbing those whose unfair methods threatened to drive their competitors out of business was constantly emphasized. It was urged that the best way to stop monopoly at the threshold was to prevent unfair competition; that the unfair competition sought to be reached was that which must ultimately result in the extinction of rivals and the establishment of monopoly; that by the words "unfair methods" was meant those resorted to for the purpose of destroying competition or of eliminating a competitor or of introducing monopoly—such as tend unfairly to destroy or injure the business of a competitor; that the law was necessary to protect small business against giant competitors; that it was an effort to make competition stronger in its fight against monopoly; that unfair competition was that practice which destroys competition and establishes monopoly. These and similar statements run through the debate from beginning to end. Although protection to the public interest was recognized as the ultimate aim, comparatively little was said about it.

It is true, at least generally, that statements made in debate cannot be used as aids to the construction of a statute. But the fact that throughout the consideration of this legislation there was common agreement in the debate as to the great purpose of the act, may properly be considered in determining what that purpose was and what were the evils sought to be remedied. In *Ho Ah Kow* v. *Nunan*, 5 Sawy. 552, it appeared that the Board of Supervisors of San Francisco had adopted an ordinance which provided that every male person imprisoned in the county jail, etc., should immediately upon his arrival at the jail have the hair of his head " cut or clipped to an uniform length of one inch from the scalp thereof." The ordinance was attacked as being hostile and discriminating legislation against the Chinese, and in order to demonstrate this, in spite of the general terms of the ordinance, statements of supervisors made in debate were

put in evidence. Mr. Justice Field, speaking for himself and Judge Sawyer, said (p. 560):

"The statements of supervisors in debate on the passage of the ordinance cannot, it is true, be resorted to for the purpose of explaining the meaning of the terms used; but they can be resorted to for the purpose of ascertaining the general object of the legislation proposed, and the mischiefs sought to be remedied."

While it is impossible from the terms of the act itself, and in the light of the foregoing circumstances leading up to its passage, reasonably to conclude that Congress intended to vest the Commission with the general power to prevent all sorts of unfair trade practices in commerce apart from their actual or potential effect upon the trade of competitors, it is not necessary that the facts point to any particular trader or traders. It is enough that there be present or potential substantial competition, which is shown by proof, or appears by necessary inference, to have been injured, or to be clearly threatened with injury, to a substantial extent, by the use of the unfair methods complained of.

In *Federal Trade Comm.* v. *Winsted Co.*, 258 U. S. 483, it appeared that a manufacturer engaged in selling underwear and other knit goods made partly of wool, labeled them as "natural merino," "natural wool," "Australian wool," etc. It was shown that a substantial part of the consuming public and some buyers and retailers understood the words used in the labels to mean that the underwear was all wool. Part of the public was thereby misled into selling or into buying, as all wool, underwear which was in large part cotton. The labels were false and calculated to deceive, and did in fact deceive, a substantial portion of the purchasing public. This court, after saying that the facts show that a proceeding to stop the practice was in the interest of the public, added (page 493):

"And they show also that the practice constitutes an unfair method of competition as against manufacturers of all wool knit underwear and as against those manufacturers of mixed wool and cotton underwear who brand their product truthfully. For when misbranded goods attract customers by means of the fraud which they perpetrate, trade is diverted from the producer of truthfully marked goods. That these honest manufacturers might protect their trade by also resorting to deceptive labels is no defense to this proceeding brought against the Winsted Company in the public interest."

And again, at page 494, after reaffirming the existence of the public interest, the court said:

". . . since the business of its trade rivals who marked their goods truthfully was necessarily affected by that practice, the Commission was justified in its conclusion that the practice constituted an unfair method of competition; . . ."

The court below thought that the trade to be protected " was that legitimate trade which was entitled to hold its own in the trade field without embarrassment from unfair competition." There is much force in this conception of the act, and the language just quoted from the *Winsted* case seems inferentially to lend it support. Certainly, it is hard to see why Congress would set itself to the task of devising means and creating administrative machinery for the purpose of preserving the business of one knave from the unfair competition of another. In the present case, however, we do not find it necessary further to consider the merits of this view or to determine whether the facts are such as to bring the case within it.

Findings of the Commission justify the conclusion that the advertisements naturally would tend to increase the business of respondent; but there is neither finding nor evidence from which the conclusion legitimately can be drawn that these advertisements substantially injured or tended thus to injure the business of any competitor or

of competitors generally, whether legitimate or not. None of the supposed competitors appeared or was called upon to show what, if any, effect the misleading advertisements had, or were likely to have, upon his business. The only evidence as to the existence of competitors comes from medical sources not engaged in making or selling " obesity cures," and consists in the main of a list of supposed producers and sellers of " anti-fat remedies " compiled from the files and records of the Bureau of Investigation of the American Medical Association, a list which appears to have been gathered mainly from newspapers and advertisements. The only specific evidence was that of a witness who said that he had purchased in drug stores in Chicago five different anti-fat treatments and could have purchased a sixth. How long they had been in stock, what was their nature, whether they were intended to be used internally, or in what way they competed or could compete with respondent's preparation, does not appear. Of course, medical practitioners, by some of whom the danger of using the remedy without competent advice was exposed, are not in competition with respondent. They follow a profession and not a trade, and are not engaged in the business of making or vending remedies but in prescribing them. It is impossible to say whether, as a result of respondent's advertisements, any business was diverted, or was likely to be diverted, from others engaged in like trade, or whether competitors, identified or unidentified, were injured in their business, or were likely to be injured, or, indeed, whether any other anti-obesity remedies were sold or offered for sale in competition, or were of such a character as naturally to come into any real competition, with respondent's preparation in the interstate market. All this was left without proof and remains, at best, a matter of conjecture. Something more substantial than that is required as a basis for the exercise of the authority of the Commission.

654

Whether the respondent, in what it was doing, was subjecting itself to administrative or other proceeding under the statute relating to the misbranding of foods and drugs we need not now inquire for the administration of that statute is not committed to the Federal Trade Commission.

A proceeding under § 5 is not one instituted before the Commission by one party against another. It is instituted by the Commission itself, and is authorized whenever the Commission has reason to believe that unfair methods of competition in commerce are being used, and that a proceeding by it in respect thereof would be to the interest of the public. Acting upon its belief, the Commission issues charges and enters upon an inquiry which, of course, it has jurisdiction to make. But one of the facts necessary to support jurisdiction to make the final order to cease and desist, is the existence of competition; and the Commission cannot, by assuming the existence of competition, if in fact there be none, give itself jurisdiction to make such an order. If, as a result of the inquiry, it turn out that the preliminary assumption of competition is without foundation, jurisdiction to make that order necessarily fails, and the proceeding must be dismissed by the Commission. Compare *Federal Trade Comm.* v. *Klesner, supra, pp.* 29–30. That course should have been followed here.

The decree of the court below is *Affirmed.*