## ALGOMA LUMBER CO. et al. v. FEDERAL TRADE COMMISSION.

### No. 6716.

Circuit Court of Appeals, Ninth Circuit.

April 4, 1933.

See, also, 56 F.(2d) 774.

Warren Olney, Jr., Allan P. Matthew, Carl I. Wheat, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for petitioners.

Robt. E. Healy, Chief Counsel, Martin A. Morrison, Asst. Chief Counsel, and Eugene W. Burr, all of Washington, D. C., for respondent.

Edward S. Rogers and William T. Woodson, both of Chicago, Ill., amici curiæ.

Before WILBUR, Circuit Judge and JAMES and NORCROSS, District Judges.

NORCROSS, District Judge.

The petition presents for consideration a review of orders made by the Federal Trade Commission on June 8, 1931, in the so-called "White Pine Cases" requiring the petitioning lumber manufacturers to cease and desist from using the word "white" in conjunction with the word "pine" in connection with the sale in interstate commerce of lumber manufactured from the species of pine tree botanically known as pinus ponderosa.

Petitioners herein are twelve of a group of fifty manufacturers on the Pacific Coast, against which the Commission issued similar complaints on May 23, 1929. Each of these concerns was charged with the interstate sale of lumber under various terms, including the phrase, "white pine," with the alleged result of misleading and deceiving the trade and public to the injury of competitors and the public, and that the same is an "unfair method of competition forbidden by section 5 of the Federal Trade Commission Act" (15 US

CA. § 45). The term employed by each of petitioners here is "California White Pine."

"To sustain the orders of the commission, three requisites must exist: (1) That the methods used are unfair; (2) that they are methods of competition in interstate commerce; and (3) that a proceeding by the commission to prevent the use of the methods appears to be in the interest of the public." Federal Trade Commission v. Royal Milling Co., 53 S. Ct. 335, 336, 77 L. Ed. —— (decided February 6, 1933); Fed. Trade Comm. v. Raladam Co., 283 U. S. 643, 646, 647, 51 S. Ct. 587, 75 L. Ed. 1324, 79 A. L. R. 1191. That the use of the expression, "California White Pine," is a method of competition, there is no question. The only questions presented are whether requisites (1) and (3), found by the Commission to exist, are supported by the testimony. If so supported, the statute provides that such findings "shall be conclusive." Fed. Trade Comm. v. Winsted Hosiery Co., 258 U. S. 483, 491, 42 S. Ct. 384, 66 L. Ed. 729.

In Federal Trade Commission v. Raladam Co., 283 U. S. 643, 51 S. Ct. 587, 590, 75 L. Ed. 1324, 79 A. L. R. 1191, the Supreme Court said: "In a case arising under the Trade Commission Act the fundamental questions are, whether the methods complained of are 'unfair,' and whether, as in cases under the Sherman Act, they tend to the substantial injury of the public by restricting competition in interstate trade and 'the common liberty to engage therein.' The paramount aim of the act is the protection of the public from the evils likely to result from the destruction of competition or the restriction of it in a substantial degree. * * *"

In Federal Trade Commission v. Sinclair Refining Co., 261 U. S. 463, 43 S. Ct. 450, 454, 67 L. Ed. 746 the court said: "The great purpose of both statutes was to advance the public interest by securing fair opportunity for the play of the contending forces ordinarily engendered by an honest desire for gain. And to this end it is essential that those who adventure their time, skill, and capital should have large freedom of action in the conduct of their own affairs."

This court in Hills Bros. v. Fed. Trade Comm., 9 F.(2d) 481, 484, said: "The court is only concerned with the question whether there is any competent testimony to support the findings of the commission."

Pinus ponderosa belongs botanically with the so-called "yellow pine" group. The typical "yellow pine" is the longleaf pine of the South, a hard lumber useful where strength is needed, and classified botanically as pinus palustris and pinus taeda. When lumber from the pinus ponderosa trees came into local use in California, it was given the name "California White Pine" in order to distinguish it from the hard "yellow pines" of the South. By 1886 it was so marketed in the states of California, Nevada, and Utah with occasional shipments further east. By about 1900 it was so marketed in the middle West sections, and about 1915 shipments extended to the Atlantic Coast.

The only species of true botanical "white pines" of commercial importance are Northern White Pine, and two Pacific Coast varieties—Idaho White Pine and Sugar Pine. The annual production of Northern White Pine in the United States is 825,000,000 feet B. M., of which 358,000,000 feet is from virgin timber in Minnesota, the remainder, 467,000,000 feet, being in the main second growth from the original forests stretching throughout the northern and eastern sections of the United States from Minnesota to the Atlantic Coast. The annual production of Idaho White Pine is 500,000,000 feet and of Sugar Pine 280,000,000 feet. The annual production of Ponderosa is 2,800,000,000 feet, of which more than half has been sold since 1924 as "Pondosa Pine," and the remainder as "California White Pine," "Arizona White Pine," and "New Mexico White Pine."

Prior to 1924 the majority of Washington, Idaho, Western Montana and Northern and Central Oregon producers of Ponderosa were designating their lumber "Western White Pine." Upon application for complaints against them the Commission investigated this trade term. As a result of an agreement entered into by most of such producers in that year the name "Pondosa Pine" was adopted as a substitute. In the brief of counsel appearing as amicus curiæ is the statement that following the said orders of the Commission of June 8, 1931, the name was again changed to "Ponderosa Pine."

Statistical Bulletin No. 21 of United States Department of Agriculture (Commission's Exhibit 34) gives a statement of the total timber stand in the United States for the year 1920 in board feet as follows:

Pinus Ponderosa ("California White Pine") and Pinus Jeffreyi (Jeffrey Pine) 249,578,000,000.

Pinus strobus ("Northern White Pine") and Pinus resinosa ("Norway Pine") 23,457,000,000.

Pinus Monticola ("Idaho White Pine")

and Pinus lambertiana ("Sugar Pine") 57,-071,000,000.

From the foregoing it appears that the available supply of ponderosa and its kindred Jeffrey pine is about three times greater than the total available supply of the botanically true white pine timber in this country. The record also discloses an estimate of more than 15,000,000,000 board feet of Northern white pine (Strobus) within the Canadian Provinces. At the rate of consumption given, not considering second growth, the present stand of timber will be practically exhausted within sixty years.

In Respondent's Exhibit No. 31—"U. S. Department of Commerce Bureau of Standards—Lumber—Simplified Practice Recommendation R 16-29" (Issued December 5, 1929) there appears under the heading "Nomenclature of Commercial Softwoods" the statement: "The following standard commercial names for lumber cut from the principal species of softwoods shall be used in the formulation of lumber-grading rules and in the construction of contracts and the terms of purchase and sale of American Standard lumber. Preferred commercial names are shown in italic."

Here follows under subheadings of various names of trees such as cedars, firs, hemlocks, etc., the "Standard commercial name" of lumbers, produced therefrom. Under the subheading "Pines" appear sixteen names, the following among others: "Arkansas soft pine," "California white pine," "Idaho white pine," "Longleaf pine," "North Carolina pine," "Northern white pine," "Norway pine," "Pondosa pine," "Southern pine," "Sugar pine." Placed opposite each such "Standard commercial name" is the proper botanical name or designation. Of the sixteen names, ten are of the botanical yellow pine. While commercially pine lumber falls within two main groups—the white and the yellow pines, it may be noted that the Bureau of Standards in the exhibit referred to makes no such groupings as it does in the case of "Douglas Fir" and "The true firs."

While action taken by the Bureau of Standards is persuasive in a case of this character, it is not necessarily controlling on the Federal Trade Commission or the courts. There may be cases in which the action of the bureau should be regarded as decisive. As said by the Circuit Court of Appeals, Seventh Circuit, in a recent case, Kirk & Co. v. Fed. Trade Comm., 59 F. (2d) 179, 183: "We deem it quite pertinent and decisive of the question before us. The government,

through its agency, the Bureau of Standards, has thus committed itself to the proposition that castile soap may be made of oily and fatty elements other than olive oil. Being solely a question of fact we deem it expedient for other departments of the government, including the judiciary, to accept such construction, if for no other reason than that of consistency."

It would not necessarily follow from this decision that a yellow pine might be sold as a white pine if such sales were unfair to the trade and injurious to the public, notwithstanding the Bureau of Standards had specified a name such as "California white pine" in a list of "Standard commercial names" for pine lumber. It would be different, however, if the particular lumber sold under such name possessed substantially the same qualities possessed by the white pines of commerce as distinguished from certain well known commercial yellow pines.

As shown by Bulletin 556 of the United States Department of Agriculture (Respondent's Exhibit 21) in the physical properties of weight, stiffness, strength, hardness, and shrinkage, ponderosa compares favorably with strobus. Expert witnesses from the United States Forest Products Laboratory place ponderosa in its mechanical properties with the typical white pine lumbers. There appears to be no serious question in this respect.

A statement by E. P. Ivory, formerly with the United States Forest Service, a witness called by the Commission, succinctly presents certain facts: "There are 37 pine species in the United States and just as the oaks are divided into white and red oak groups, so the pines are divided into white and yellow pine groups. Botanically, California white pine falls in the yellow pine group chiefly because it has three long needles in each bundle, whereas the white pines have five. The physical properties and uses of the wood cut from this tree, however, align it with the white pine group and set it apart very distinctively from the yellow pine group."

From the testimony of this witness there also appears the statement: "Physical properties of California white pine, as demonstrated in tests made at the U. S. Government Forest Products Laboratory, Madison, Wisconsin, and its uses, closely align California white pine with the botanical white pines. In fact, in many of its most important qualities and uses California white pine is more typically a white pine than are some species which botanically are classified as white pines."

The finding of the Commission to which objection is principally directed as not being supported by the evidence reads: "True white pine lumber is far more durable than Ponderosa lumber when exposed to weather conditions. The Ponderosa pine has on an average a far greater amount of sapwood than trees generally used for lumber. The sapwood of the Ponderosa is less durable than any other part of the tree—especially when exposed to weather conditions. It is the sapwood of the Ponderosa that most closely resembles the heartwood of the true white pines in appearance and softness. It is the sapwood of the Ponderosa that it usually sold for uses and purposes for which the heartwood of the true white pines is celebrated. The close resemblance between the heartwood of the true white pines and the sapwood of the Ponderosa above noted, is one of the greatest causes of the confusion and deception in the marketing of the two species."

The gist of this finding is that true white pine lumber is far more durable and has a far less percentage of sapwood than ponderosa lumber, and that the close resemblance between the heartwood of true white pines and the sapwood of ponderosa is one of the greatest causes of confusion and deception in the marketing of the two species.

An exhibit in the record discloses that the sapwood of the true white pine tree appears to be about 1¾ inches in thickness as compared with 3 inches for the yellow pine. The relative percentage of sapwood in a particular tree depends largely upon its diameter. The attention of the court is directed to a chart showing a strobus tree 9½ inches in diameter to have 60 per cent. sapwood, while a ponderosa tree 18 inches in diameter has 55 per cent. sapwood content, and trees of 21 inches in diameter have a sapwood content of 30 per cent. and 48 per cent., respectively. While these figures are interesting as showing the proportion of sapwood and heartwood content of logs, they do not necessarily indicate the relative proportion of sapwood and heartwood content in the lumber produced therefrom. That there is a greater percentage of sapwood content in ponderosa lumber than there is in the true white pine lumber, there is no question. This variation, however, appears to be of importance only as it has a bearing upon the relative durability of the two classes of lumber. It is the sapwood which was found by the Commission to be more subject to decay when applied to exterior uses.

Upon the question of durability of ponderosa as compared with the true white pines

the testimony of a number of witnesses appears in the record. A reference to the testimony of a few only will be sufficiently illustrative. Russell F. Whitehead, a New York City architect and editor of an architectural journal, testified that lumber made from ponderosa "is not a satisfactory substitute for genuine white pine to use in exterior of a building, in any way, shape or form." The witness further testified that he regarded it as reasonably satisfactory for interior purposes, "but not if exposed to the weather." W. B. Greeley, for seven years chief forester of the United States and now manager of the West Coast Lumberman's Association, Seattle, testified: "The genuine white pines have the reputation for greater durability in uses exposed to the weather. That would not apply to interior uses protected from the weather." George W. Kelham, for twenty-two years an architect in San Francisco, testified as to the use of ponderosa where exposed to the weather: "It is unsatisfactory under those conditions, and that would be the general opinion of the architects that I know. * * * It doesn't, in our opinion, last well. It decays more rapidly than other wood."

Professor C. P. Winslow, director of the United States Forest Products Laboratory at Madison, Wis., since 1917, to the question, "What is the difference between white pine and Pinus ponderosa as to durability?" answered: "I don't know."

Professor G. M. Hunt of the same laboratory, testified: "The general experience with the use of the White Pines during the 200 years since they began to be used indicated that these pines had moderately high durability. The general experience with Pinus Ponderosa indicated that that wood had low durability in contact with the ground or any place favoring the growth of decay. That is a matter of common knowledge." To the question, "Have there been tests which will adequately settle the question as to the relative decay resisting qualities of the heartwood of Pinus Ponderosa and the heartwood of Pinus Strobus?" Professor Hunt answered: "There have not."

The weight to be given to testimony above outlined upon the question of the relative durability of the two lumbers is not as clear as it might otherwise seem to be, viewed in the light of other facts and circumstances. The expression that Ponderosa lumber is not a satisfactory substitute "for use in exterior of a building, in any way, shape, or form," may well be viewed in the light of the fact that buildings erected from lumber from the

original Northern white pine forests have withstood the elements for two centuries, while but few, if any, erected with lumber from the Ponderosa tree may lay claim to an age in excess of about seventy-five years. Specific instances of decay under ordinary conditions of upkeep are almost wholly lacking in the record. The director of the Forest Products Laboratory did not know what the difference in durability is. Professor Hunt's testimony was to the effect that it was a matter of common knowledge from general experience that Ponderosa "had low durability in contact with the ground or any place favoring the growth of decay." As most of the lumber used even for exterior purposes does not come in contact with the ground, it would not necessarily follow that such lumber might not in other respects have moderately high durability unless the witness meant to say that any exterior use was a "place favoring the growth of decay." The testimony of the witness does not appear to warrant the latter interpretation. What the testimony appears to establish is that Northern white pine has relatively a greater durability for exterior use without establishing any comparative degree of such durability.

Upon the question of public confusion in the matter of lumber nomenclature, the testimony of a number of witnesses appears in the record. Mr. Alfred Busselle, for twenty-five years a practicing architect in New York, specializing in high-grade residential work, testified "In my experience there is a great deal of confusion in the pine market due to the terminology, and some of the confusion is quite honest. * * * I know that California white pine connotes to some people a distinct type of wood, but it connotes to other people, white pine in general, and therein lies the confusion." Those who are confused, generally speaking, the witness testified were the "millmen and the lumber dealers, as well as the architects." Just why architects and lumber dealers should be confused in view of the aid and assistance furnished by the government through the Bureau of Standards is not readily apparent. It may properly be assumed that architects have a general knowledge of the qualities of the various materials they specify. If it is deemed important that a particular residence or other building be constructed of so-called true white pine because of its known or claimed superior wearing or other qualities, a reference to the standard commercial names —"Northern White Pine," "Idaho White Pine," or "Sugar Pine," will enable the architect to so specify, and the contractor and dealer to comply with the specifications. The testimony does not support a view that when architects so specify there is any confusion or even any material amount of intentional substitution of some other lumber than that specified. It is clearly established by the testimony that the true white pines are sufficiently well known in the trade to be able to command a higher price over that sold under the trade name of California White Pine or Pondosa.

The testimony of a number of witnesses engaged in the retail trade in various states is to the effect that orders for white pine lumber without other designation, would be filled by any lumber using the designation "white," including California White Pine. It does not appear, however, from the testimony of these witnesses that in filling such orders with California White Pine, or with other lumber using the designation "white," and which was not a botanically true white pine, a practice prevailed of charging a price therefor on a basis of the market price for Northern or Idaho White Pine.

P. J. Curley, president for five years of a wholesale and retail lumber house at Chicago, testified: "It is commonly known among the sash and door men if a specification comes in for White Pine, they will furnish California White Pine or so-called Western Pine or Pondosa Pine, without attempting to get the genuine Northern White Pine or Idaho White Pine."

The reason for the substitution the witness testified "is the lower price, lower cost to the sash and door men or to the interior men." The amount of such substitution the witness estimated at "about ninety-five per cent."

If it be considered that manufacturers of sash and doors and exterior trim use ponderosa lumber principally in such manufacture, and supply the same when the specification calls for white pine, the important question remains of the character of material so supplied and whether a price is charged therefor based on the difference in cost of the two lumbers. There is no testimony touching the question of price of this particular character of manufactured product. With the exception of the possible question of durability, the materiality of which has not been established, it does not otherwise appear the public is injured by action of such manufacturers. If, as testified by the witness Curley, these manufacturers use Ponderosa pine as readily as they do California White Pine in

filling specifications calling for white pine, it is not apparent that an affirmance of the Commission's orders would afford any relief if injury from such manufacture in fact occurs.

In the finding of the Commission complained of appears the statement: "It is the sapwood of Ponderosa that most closely resembles the heartwood of the true white pines in appearance and softness." In respondent's brief appears the statement: "True white pines excel ponderosa in the soft texture of the wood as an average. * * * " The court's attention has not been called to any tests made of the relative hardness of heartwood as compared with sapwood. The tests made by the United States Forest Products Laboratory for "Hardness (side section)" show Ponderosa softer by 2 per cent. and "(end section)" softer by more than 6 per cent. than Strobus. In comparison with the Southern Yellow Pine (longleaf) both woods are softer by more than 50 per cent.

As bearing on the question relative to the contention that the use of the commercial name—"California White Pine"—is unfair to the trade, we quote the following excerpt from the brief of respondent: "Idaho white pine, in 1922 and 1923, had a premium of $16 or $17 per thousand feet. Since the decline of 1927 the premium has been but $5.-50 to $8.50. In September, 1927, the Weyerhaeuser Sales Company made a drastic cut in Idaho white pine largely for the reason that the Weyerhaeuser concerns 'had come to the conclusion that, because other woods not true white pines were being marketed under the white pine name, it was no longer possible to get the price preferences that we had previously gotten.'"

It may be noted, however, in connection with the foregoing statement, that the reduction in price did not occur until three years after the commercial name of half of the Ponderosa of commerce was changed from Western White Pine to Pondosa.

It may be conceded that if the use of the commercial name—California White Pine—is prohibited in the lumber trade, Northern White Pine and Idaho White Pine will be able to command a higher price than that which now prevails over lumber produced from the forests of Ponderosa pine. If this situation be conceded, and it be further conceded that the increased price of Strobus lumber finds a correlative reduction in the price of Ponderosa lumber, the further question remains whether such change in commercial methods of sale will be in the interest of the public.

The case of Federal Trade Commission v. Winsted Hosiery Co., 258 U. S. 483, 42 S. Ct. 384, 385, 66 L. Ed. 729, is stressed in the brief of respondent as one presenting a "remarkable parallel" respecting the use of unfair methods, the prevention of which is in the interest of the public. From the opinion we quote the following excerpt: "A substantial part of the consuming public, and also some buyers for retailers and sales people, understand the words 'Merino,' 'Natural Merino,' 'Gray Merino,' 'Natural Wool,' 'Gray Wool,' 'Australian Wool' and 'Natural Worsted,' as applied to underwear, to mean that the underwear is all wool. By means of the labels and brands of the Winsted Company bearing such words, part of the public is misled into selling or into buying as all wool, underwear which in fact is in large part cotton. And these brands and labels tend to aid and encourage the representations of unscrupulous retailers and their salesmen who knowingly sell to their customers as all wool, underwear which is largely composed of cotton."

The sale or purchase of a material as all wool which in fact is in large part cotton presents a situation which may not be said to be parallel to that presented upon the facts in this case. If a material from a gray wool from some other breed of sheep than a Merino were dealt with in commerce under the name of "Merino" or "Gray Merino," then there might be some parallel between the two cases. In the case at bar we are considering questions as between certain pine lumbers. The use of the word "white" is here sought to be prohibited in connection with the trade name of a lumber produced from a certain species of pine tree which botanically falls within the yellow pine group, but which in its industrial utility comes within the white pine group as known to commerce and industry. In the field of commerce and industry there are but two groups of pine lumbers— the white and the yellow. Primarily this grouping reflects the industrial utility of the several lumbers. While botanically Pinus Ponderosa falls within the same general classification as Pinus Polustris, the lumber from which latter trees first became known to commerce as Southern Yellow Pine, Ponderosa in industrial utility possesses more nearly the qualities of Pinus Strobus, which as Northern White Pine was the first of the pines known to commerce using the designation "white."

It may be conceded that the evidence establishes that Northern White Pine lumber from the forests of Minnesota and Idaho

White Pine lumber possess certain qualities which make those lumbers a superior grade to lumber produced and sold as California White Pine. When we compare Idaho White Pine with Northern White Pine we find that the Department of Agriculture (Exhibit 21) records the former as possessing greater strength and stiffness, but with all a softer quality. As said in the brief for respondent: "Lumber is a product of growth, not an inorganic, chemical product. Lumber from any given species, even the most uniform, will vary somewhat in quality. Where species are similar in average quality, or where the variations in a species are great there will be some overlapping." In considering California White Pine with Northern White Pine, for example, the fact may not be overlooked that the greater portion of the annual production of such lumber, 467,000,000 board feet, comes from second growth timber. Concerning this second growth lumber, in the brief of respondent, we read: "While most of the new growth of Strobus is being prematurely cut and used for inferior purposes, yet doubtless many areas are being allowed to stand for their maximum value." This statement is suggestive of the fact that the public interest is not promoted by the premature cutting of second growth timber.

In considering the fact that certain of the so-called true white pines produce lumber superior in certain respects to that produced from Ponderosa, there is also to be considered the fact that these species of true white pines differ also from each other as the so-called true yellow pines differ from each other. Whatever these differences are, in commerce and industry pine lumber is classified into two groups, white pine and yellow pine, and any lumber falls within one or the other of these two main groupings, largely if not entirely because of its peculiar industrial utility.

In considering the weight to be given to the fact that Ponderosa is not only not a botanical true white pine, but in certain respects is also inferior in a more or less uncertain degree to certain of the true white pines of commerce, the past history, as well as the future of the industry is deserving of consideration. The supply of the botanical true white pine is far more limited than that of Ponderosa. The public is not only interested in not being deceived in the material it purchases under a certain nomenclature, but possibly in an even larger sense in the conservation of the forests. In the brief for respondent appears this statement: "The superiority of true white pine lumber over

ponderosa has been reflected in the fact that Northern White Pine, Idaho White Pine, and Sugar Pine have all commanded a higher price on the market than ponderosa. The price differentials still continue."

It is manifest from this statement that notwithstanding the fact that Ponderosa has been sold in markets throughout the country under the commercial name California White Pine, and under other names using the word "white," for more than fifteen years prior to the institution of this proceeding, the so-called true white pines were able to command a higher price.

It is the conclusion of the court that viewing the testimony in the light of all the facts of the case, it is insufficient to support findings that petitioners' use of the commercial name California White Pine is an unfair method of competition or that its prevention would be in the interest of the public.

The orders complained of should be annulled and set aside. It is so ordered.