## BELMONT LABORATORIES, Inc., v. FEDERAL TRADE COMMISSION.
### No. 6738.

Circuit Court of Appeals, Third Circuit.
March 29, 1939.

Rehearing Denied May 3, 1939.

Further Rehearing Denied May 15, 1939.

Laurence H. Eldredge and Montgomery & McCracken, all of Philadelphia, Pa., for petitioner.

W. T. Kelley, Chief Counsel, Federal Trade Commission, Martin A. Morrison, Asst. Chief Counsel, and DeWitt T. Puckett and James W. Nichol, Sp. Attys., all of Washington, D. C., for respondent.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The Federal Trade Commission had before it here a rather mild instance from a black chapter of American business history. The emptor who is greedy (mail fraud) or gluttonous (food) or vain (cosmetics) may be getting more protection that he deserves; so he perchance should be forced to "cavere". Around the emptor whose sole desire is relief from the ills to which our mortal flesh is heir, the law has thrown too transparent and tardy a cloak. That, at least, is the opinion of those who should know.

A distinguished Senator of the United States: "They are the people, who for the sake of a few dirty dollars, are willing to imperil the comfort, the wealth, and the lives of millions of people who cannot protect themselves." From a speech by Senator McCumber sponsoring the original Pure

Food and Drugs Act (1906), 40 Cong.Rec., Part 3, p. 2653.

A leading medical authority:

"In the field of medicine human credulity learns little from experience. In the purchase of any kind of merchandise, except that sold for the alleged alleviation or cure of disease, the buyer has a chance of learning eventually whether or not he has been swindled. In the purchase of an automobile, a piano, or a suit of clothes, time will prove whether it was a good or a bad bargain; nature, through its agencies of wear and tear, makes clear whether one has been cheated. But when we go into the market to buy medicament or medical service, we are at sea for here we have nature not as an assistant to aid our judgment but as an opponent to confuse it. In from 80 per cent to 85 per cent of all cases of human ailments, it is probable that the individual will get well whether he does something for his indisposition or does nothing for it. The healing power of nature—vis medicatrix naturae—fortunately for biologic perpetuity, works that way. The seller of medicaments, then, obviously starts with at least an eighty per cent chance in his favor.

"The pills and panaceas of today are colloquially, but incorrectly, called 'patent medicines'; incorrectly, because among the thousands of remedies offered to the public for the self-treatment of disease there are probably not half a dozen that are really patented. The reasons are not far to seek. The United States Patent Office is not supposed to grant a patent on a product unless it can be shown that the article on which protection is sought is a new and useful invention. This simple requirement is sufficient in itself to prevent practically all so-called 'patent medicines' from being patentable." From the Introduction (p. vii) of Dr. Arthur J. Cramp's 3rd volume of Nostrums and Quackery and Pseudo-Medicine.

A leading legal scholar: "The seriousness of the problem of false advertising, both sociologically and financially, requires no demonstration. The toll which is assessed upon the consumer runs into the millions; the effects upon the health and well-being of the community are incapable of estimation." Handler, The Jurisdiction of the Federal Trade Commission Over False Advertising, 31 Columbia Law Review 527, 551.

A leading journalist: "In the patent-medicine business, the essential art was not medicine, nor chemistry. The fundamental genius for it was psychological. It consisted of skill in playing on the credulity of the simple-minded and the trusting.

\* \* \* \* \* \*

"The patent-medicine manufacturers made an art of describing the symptoms of diseases in such a way as to terrorize the reader of their pamphlets and advertisements into believing he had one or more of the ailments they pretended to cure; and in describing their cure-alls in terms to convey the conviction of hope." Mark Sullivan, Our Times, Vol. II, America Finding Herself, p. 511.

A distinguished former President and Chief Justice of the United States: "Fraudulent misrepresentations of the curative value of nostrums not only operate to defraud purchasers but are a distinct menace to the public health. There are none so credulous as sufferers from disease. The need is urgent for legislation which will prevent the raising of false hopes of speedy cures of serious ailments by misstatements of facts as to worthless mixtures on which the sick will rely while their diseases progress unchecked." President Taft, Message to Congress June 21, 1911, see 48 Cong.Rec., Part 12, p. 675.

The present distinguished Chief Justice of the United States: "\* \* \* we find no ground for saying that Congress may not condemn the interstate transportation of swindling preparations designed to cheat credulous sufferers and make such preparations, accompanied by false and fraudulent statements, illicit with respect to interstate commerce, as well as, for example, lottery tickets." In sustaining the Sherley Amendment (U.S.C.A. Title 21, sec. 10) to the original Pure Food and Drugs Act, an amendment made necessary by the failure of the majority of the Court in the case of United States v. Johnson, 221 U.S. 488, 31 S.Ct. 627, 55 L.Ed. 823, to agree with his views. Seven Cases v. United States, 239 U.S. 510, 516, 517, 36 S.Ct. 190, 60 L.Ed. 411.

It is thus apparent that our "mild" is not in characterization of ethics but in description of harm. The products advertised (Mazon), a soap and an ointment, are germane only to the treatment of certain diseases of the skin. These diseases, always irritating and sometimes painful,

540

may work from the inside out. As the reverse is not true, they affect the case and not the wheels of our human watch. They cannot, therefore, make it cease ticking. So the false therapeutic claims of the petitioner company may disappoint. The disappointment will not; however, be fatal.

The advertisements objected to are curative, not palliative in tenor. They assert the "elimination" rather than the alleviation of the conditions treated. They are listed as Federal Trade Commission Exhibits 4, 3, and 2B and read:

In circulars addressed to members of the medical profession:

"Mazon—an ethical preparation compounded under the personal supervision of its originator—is the *original* treatment of its character for:

| | |
|---|---|
| Eczema | Ring Worm |
| Psoriasis | Athlete's Foot |
| Head Scalds | Barber's Itch |
| Ivy Poison | And Other Skin Disorders |

The colloidal nature of the base of Mazon and its strong penetrating characteristics, together with its healing and soothing ingredients, afford quick and *permanent* elimination of Eczema and *other* skin disorders." Federal Trade Commission's Exhibit 4.

" 'No other treatment for *permanent cure* has ever been discovered. * * * Some of the best-known skin specialists in the City (of Philadelphia) are using it *exclusively* and praise it highly.' " Federal Trade Commission's Exhibit 4.

In a professional journal having wide circulation among graduate nurses: "Thousands of physicians have clinically proved the effectiveness of Mazon treatment, and are prescribing it daily to permanently eliminate:" (diseases substantially similar to those listed above). Federal Trade Commission's Exhibit 3.

In leaflets (somewhat less boastful) contained in each individual package of its product: "The therapeutic value and distinctive characteristics of Mazon were immediately recognized by physicians, who by personal clinical tests and observations, proved to their own satisfaction the unusual effectiveness of Mazon in the treatment and *elimination* of symptoms associated with certain types of:

ECZEMA PSORIASIS ALOPECIA DANDRUFF RING WORM IVY POISON ATHLETE'S FOOT and *other* skin irritations."

Federal Trade Commission's Exhibit 2B.

"DO NOT ATTEMPT TO DIAGNOSE YOUR OWN SKIN CONDITION

"Consult your physician and be guided by his advice."

Federal Trade Commission's Exhibit 2B.

Such a claim is medically untrue. It fails to recognize the scientific necessity for the application of internal remedies to diseases, which, by their etiology (the science of causes), proceed from internal disorders. Ring worm, head scalds (favus), athlete's foot, barber's itch, and ivy poison are excluded from this necessity. They are due to external causes, ring worm, favus and athlete's foot being parasitic or fungoid in character, and ivy poison being an irritant reaction from a vegetable fibre. In eczema, psoriasis, alopecia (falling hair) and dandruff (seborrhea, a cause of alopecia) on the other hand, the outward manifestation is, in part at least, the result of an inward disturbance. There is something amiss in the interaction of the body's chemical elements (metabolism). As both the physicians who testified are, with one possible exception, in agreement as to what we have just said, we do not have to corroborate their testimony by resort to any principle of judicial notice, Illinois Cudahy Packing Co. v. Kansas City Soap Co., D.C., 247 F. 556; 23 C.J. 168. It is nevertheless comforting to find the medical works in complete accord, Knowles, Diseases of the Skin, as to: ringworm, p. 394, favus, p. 384, athlete's foot, p. 389, barber's itch, p. 392, ivy poison, p. 167; as to: eczema, p. 119, alopecia (there are four kinds), p. 475 et sequitur, seborrhea, p. 452. The exception spoken of is psoriasis. The medical witnesses differ on its etiology and we find the same difference in the text book, Knowles, above cited, p. 102. All, however, agree upon the necessity for internal remedies, Knowles, above cited, p. 104.

The Commission might well have stopped with this question of etiology. Once the internal cause of the disease is established, it does not take a doctor to point out the futility of an outward application to an interior evil. Such application can do no more than alleviate by modifying the exterior symptoms. Accordingly, petitioner's

advertisements, in their assertion of elimination, are bad in medicine and, fortunately for the public, bad also in law.

The advertising complained of uses two other words of, to be conservative, exaggeration—"original" and "exclusively". Dr. Saul testified, Record p. 138, that the components of the compound (Commission's Exhibit 6, record p. 159) are all "common drugs used in the practice of medicine". An examination of the medical authority already cited amply supports his view. The principal drugs indicated, sodium salicylate, resorcinol, and phenol are prescribed in the paragraphs covering external treatment of the diseases mentioned, Knowles, above cited, pp. 105, 128, 399, 461, 483. One might add that the formulae there set out are more complete.

Here "original" appears to be used in the two senses of "novel" and "not otherwise obtainable". Strictly speaking, therefore, it has no bearing on efficacy and so no relation to false hopes. But it has, it seems to us, a harmful connotation appropriate to each sense. The implication of newness is well recognized. In law what is old may be good, but in science progress is prized. One has a vision of thousands of doctors and druggists working in thousands of hospitals and laboratories and emerging with—Mazon. In the second sense it may, like the apple, keep the doctor away. It carries a suggestion of mystery and of secret sources. The fact is that, as we have seen, its ingredients can be obtained by resort to the prescription blank of the family physician.

It seems even less necessary to dwell upon the claim of exclusiveness. That, one need hardly observe, is by definition a rare attribute. What we have just said shows, we think, that there is no semblance of rarity. The "leading specialists", both those called to the witness stand and in the profession generally, may prescribe Mazon (one medical witness did and the other did not), but they do not pretend that their treatment has only that one facet.

■ We cannot, because the Federal Trade Commission did not, question either the reference in the advertising to "other" skin diseases, the claim that the ointment was prepared in collaboration with the Presbyterian Hospital in Philadelphia or the implication that some special quality in the accompanying and high priced soap makes it indispensable to an advantageous use of the ointment. Any rule of ejusdem

generis does not seem appropriate to a unilateral effect on the consumer's mind. They cannot be expected to add the limiting "like". Fisher, The Proposed Food and Drugs Act, A Legal Critique, 1 Law & Contemporary Problems, 74, 82. We imagine that the medical authorities of the Presbyterian Hospital may be surprised at the generous assistance furnished to their former pharmacist by their staff. The nature of the chemical cooperation of soap and ointment, if any, is not developed.

As might be expected from the words of the Act, i. e. "unfair" and "competition", the stock attempts to escape its incidence stress the entire absence of the first and the indefiniteness of the second. In the field of therapeutic claims, precedents are scarce. This is due, in part at least, to the discouraging history of the legislative efforts to extirpate an admitted and shocking evil. The best account of that struggle is to be found in books by those who took part in it. We refer to Chapter 27, Volume II, of Our Times, by Mr. Mark Sullivan, from which we have already quoted, and the autobiography of the famous Dr. Wiley. See also, Reiger, The Struggle for Federal Food & Drugs Legislation, 1 Law & Contemporary Problems 3; Weber, The Food, Drug & Insecticide Administration, Its History and Organization; Kallet and Schlink, 100,000,000 Guinea Pigs; Kallet, Counterfeit; and, Lamb, American Chamber of Horrors (one chapter of which is entitled, Blood Money). That history, not yet as we think ended, shows the proprietary medicine lobby fighting a successful rear-guard action against anything and everything calculated to enlighten the sick and suffering public. They fought, of course, in the courts as well as in the Congress, one of their notable victories coming strangely enough from the mouth of the son of the Autocrat of the Breakfast Table, United States v. Johnson, above cited, and requiring the passage of the Sherley Amendment, above cited, to restore the legislative intent. The Consumer's Protection Under the Federal Pure Food and Drugs Act, 32 Columbia Law Review 720; Shearer, The National Government and False Advertising, 19 Iowa Law Review 28. A comparison of the terms of the so-called Tugwell Bill (introduced by Senator Copeland as S. 1944, 73rd Cong., 1st Session) with those of the two companion and mayhap overlapping statutes which eventually became law, the Copeland Act (U.S.C.A.

542

Title 21, sec. 321) and the Wheeler-Lea Amendment (U.S.C.A. Title 15, sec. 55) leads to the belief that the lobby is still going strong. Fisher, The Proposed Food and Drugs Act, A Legal Critique, above cited; A Proposed Revision of the Food and Drug Laws, 22 Georgetown Law Journal 306; Woodward, Its an Art, Chapter 25, Congress Says "Boo"; Lamb, American Chamber of Horrors, above cited.

So we find the government department technically equipped to ascertain the truth about drugs prevented from exercising jurisdiction where the greatest damage is done, and the government department with no such facilities constrained to act lest the people perish. The author of a legislative note in a recent issue of the Virginia Law Review writes: "The Federal Trade Commission, on the other hand, has handled cases involving false advertising for a number of years with some success, despite the limitations on its jurisdiction. * * * The proceedings of the Commission in which orders are issued only after full hearings, have established an enviable reputation for their impartiality so that appeals from them are relatively infrequent. It does not appear, however, that the Commission has at present adequate means of obtaining the necessary scientific evidence to fully cope with false advertising in this field." 22 Virginia Law Review 812, 820.

We may say that the examination of witnesses gives the impression that the Federal Trade Commission's legal staff did not equip itself with even the elementary medical books we borrowed from a local physician.

We come now to a consideration of such precedents as exist. In Minter v. Federal Trade Commission, 3 Cir., 102 F.2d 69, decided February 14, 1939, we had recent occasion to discuss what we deemed a judicial tendency to broaden the meaning of competition in the interests of consumer protection. Even without such liberal construction, we think the "procedural restriction" of Federal Trade Commission v. Raladam Co., 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191 (criticized in Handler, Jurisdiction of the Federal Trade Commission Over False Advertising, 31 Columbia Law Review 527, 549, 551; Federal Trade Commission and False and Misleading Advertising, 31 Michigan Law Review 804), has been fully met by the proof

here. In fact, one of the offending circulars was distributed in explanation of some litigation with that most exasperating of all competitors, the former employee who has departed with a trade secret. For the most recent discussion of Federal Trade Commission v. Raladam Co., and the later case of Hughes, Inc. v. Federal Trade Commission, 2 Cir., 77 F.2d 886, certiorari denied 296 U.S. 617, 56 S.Ct. 137, 80 L.Ed. 438, see an interesting note in the February number of the Columbia Law Review, 39 Columbia Law Review 259, 261.

The only other case we have been able to find in the therapeutic field seems to have escaped the attention of counsel for the Commission. It is reported sub nomine, Fairyfoot Products Co. v. Federal Trade Commission, 7 Cir., 80 F.2d 684. It deals with a bunion cure in contrast with the obesity cures (Marmola, Bad-Em Salts) of the two cases previously cited. The opinion, by Judge Alschuler of the Seventh Circuit, expresses a point of view which seems to us more in accord with a suppression of the actual evil legislated against than that of some of the earlier cases. We quote:

"That petitioner's plaster has virtue may, for the purposes hereof, be conceded. Indeed, it would be quite unreasonable to assume that one putting out a purported remedy for an affliction would not employ some ingredients or means calculated to benefit some cases at some stage. But this would not justify such sweeping claims as the condemned items of this advertising matter disclose, which were evidently intended to induce in the public mind the belief that here was an absolute and unfailing panacea for bunions of all kinds and degrees.

"Just where lies the line between 'puffing,' which is not unlawful and unwarranted, and misleading representations in advertising, is often very difficult of ascertainment. But in our judgment this case does not present such embarrassment, since the advertising here condemned is well beyond any 'puffing' indulgence." Fairyfoot Products Co. v. Federal Trade Commission, 7 Cir., 80 F.2d 684, 686.

As the writer of an article to which we have several times referred (Fisher, The Proposed Food and Drugs Act, A Legal Critique, above cited, p. 82) points out: "In the field of therapeutic representation a fine line between 'remedy' and 'cure' has been drawn, although as often as not the gullible purchaser has been deceived in both

instances. * * * Some courts seem entirely too content with a 'commercial' standard of truth, piously hoping that the purchaser will not be so gullible as to be deceived by the depicted panaceas."

We are not pious and we are not content with the advertisements in the case at bar.

The suggested comparison between what was sought and what was had would have emphasized this very point. To check the obscurantism about puffing, the draftsmen offered two provisions. First, in order to discourage self-medication in the case of thirty-six named diseases, falsity was attributed to any representation made to laymen as to the effect of any drug in their treatment, A Proposed Revision of Food and Drug Laws, 22 Georgetown Law Journal 306; Fisher, The Proposed Food and Drugs Act, A Legal Critique, above cited, p. 98. The petitioner, in the less blatant of its two advertisements, makes a gesture in obeisance to this same principle. But it combines this lip service with a therapeutic claim—so the sufferer is left with a choice of reliances. Second, the test of truth was made the "general agreement of medical opinion", Fisher, The Proposed Food and Drugs Act, A Legal Critique, above cited, p. 95.

■ Petitioner addresses some argument to the especial character of its circulation. See Harding, Fads, Frauds and Physicians, Chapter 8, The Character of Medical Journal Advertising. It says that one putative audience will not read and the other will not heed. In other words, the contention is made that physicians and readers of professional journals are too smart to be deceived and that lay purchasers buy blind because the leaflet is inside the carton containing the ointment. We think that one position is untrue legally and the other factually.

■ Conceding the somewhat violent assumption that prospective patients never read medical and nursing journals, we do not concede either the ethics or the law of a proposition which puts a premium on a failure in wickedness. In the closely analogous field of common law deceit, the courts have long since refused to sanction the application of some idea of contributory negligence as a defense. Both deceit (apart from negligent misrepresentation), the genus, and false advertising, the species, are intentional torts and the "should have known or acted more wisely" of the injured are inappropriate in both cases, Green, De-

ceit, 16 Virginia Law Review 763; Bohlen, Misrepresentation as Deceit, Negligence, or Warranty, 42 Harvard Law Review 732, 739; 49 Harvard Law Review 830 (Note); Harper and McNeely, A Synthesis of the Law of Misrepresentation, 22 Minnesota Law Review 939, 957. We believe that Congress might well have given some thought to this before enacting paragraph (a) of Section 55, Title 15 U.S.C.A. If they had, they would have recognized the confusion in using the proviso of the proposed self-medication section and leaving out the section itself.

We find an equal inadequacy in the petitioner's reasoning about the causal inferences properly to be drawn from the enclosure of the leaflet. In the first place, the retailer is obviously interested in familiarizing himself with the goods he offers for sale. Recommendation will follow upon knowledge whether or not it is accompanied by belief. In the second place, the self-medicator's convincement is not dependent upon one use. He may and often must be influenced to a further purchase before success or failure is finally apparent, or he may and often must be influenced to a further purchase for treatment of some subsequent one of the other skin diseases mentioned or implied.

■ We are constrained also to ignore petitioner's plea of locus poenitentiae. Experience has compelled the Commission to insist upon the letter of its bond. So the Courts have upheld it in demanding a stipulation, Federal Trade Commission v. A. McLean & Son, 7 Cir., 84 F.2d 910, Federal Trade Commission v. Morrissey, 7 Cir., 47 F.2d 101, and in requiring that such stipulation be unconditional, Fairyfoot Products v. Federal Trade Commission, above cited, 80 F.2d page 686.

■ We arrive therefore at this conclusion. We are satisfied with the Commission's cease and desist order entered January 6, 1938, except in two particulars. We think that subparagraphs b and d of paragraph 1 should be omitted because they apply to the diseases curable through external application, and paragraph 3 should be omitted because it improperly attempts to extend the jurisdiction of the Commission to Canada. We leave untouched subparagraph a of paragraph 1. The words used therein are "competent remedy or cure". Our quotation from Fisher's The Proposed Food and Drugs Act, A Legal Critique (pages 11, 12 of this opinion) con-

tains an implied criticism of the judicial effort to draw a "fine line" between remedy and cure. We agree with that criticism and in support of it cite an excerpt from an opinion of the Circuit Court of Appeals for the Sixth Circuit: "There was still room for a conclusion that substantial mischief resided in the claim of a universally efficacious remedy for the numerous and widely prevalent maladies in question; for the term 'remedy' must at least imply a curative tendency, although not of course guaranteeing a cure." Simpson v. United States, 241 F. 841, 845.

It is hardly necessary to comment upon the synonymity of "efficacious" in the passage above quoted and "competent" in the Commission's order or to call attention to the a fortiori character of a civil proceeding. The contrary holding of United States v. Natura Co., D.C., 250 F. 925, is an example of the judicial line drawing animadverted on above.

The order of the Federal Trade Commission is modified in accordance with this opinion and is in all other respects affirmed.