## CAPON WATER CO. et al. v. FEDERAL TRADE COMMISSION.
### No. 6798.

Circuit Court of Appeals, Third Circuit.

Oct. 9, 1939.

Philip Austin, of Washington, D. C., and Joseph W. Henderson, of Philadelphia, Pa., for petitioners.

W. T. Kelley, Chief Counsel, Federal Trade Commission, Martin A. Morrison, Asst. Chief Counsel, and Edw. W. Thomerson and James W. Nichol, Sp. Attys., all of Washington, D. C., for respondent Federal Trade Commission.

Before MARIS, CLARK, and BIDDLE, Circuit Judges.

CLARK, Circuit Judge.

This is the second visit of this particular mineral water to this court. Although that fact seems to have been ignored by all counsel, a search of the Federal Digest, under appropriate headings, revealed it. In 1930 the United States libeled "94 Dozen, More or Less, Half-Gallon Bottles Capon Springs Water" then claimed by Capon Water Company, the predecessor in title of the present petitioner. On representation of different counsel the learned district judge was persuaded to dismiss the libel, United States v. 94 Dozen, More or Less, Half-Gallon Bottles Capon Springs Water, D.C., 48 F.2d 378. The United States appealed but for some reason not disclosed did not bring up the three hundred and seventy-eight pages of testimony and our court accordingly sustained the dismissal, United States v. 94 Dozen, More or Less, Half-Gallon Bottles Capon Springs Water (Capon Water Co., claimant), 3 Cir., 51 F.2d 913. We have examined that testimony, a public record, and we must say that we think it is more satisfactory than that now before us.

We are sustaining the particular order of the Commission solely because of its limited scope. We are not constrained to and therefore do not pass upon the wider controversy implicit in the subject. The dispute over balneal therapeutics has raged in the medical profession and inevitably, therefore, in the courts, ever since the Romans began "taking the waters", Valentiner, Handbuch d. Balneotherapie; Dictionnaire des Eaux Minerales, by MM. Durand-Fardel; I. Burney Yeo, The Therapeutics of Mineral Springs; W. E. Fitch, Mineral Waters of the United States and American Spas, the author, a witness in the principal case. As we understand, it still rages and should, we think, be legally, at least, put to rest by a properly prepared case. Because if these so-called mineral waters are not of any independent therapeutic value, the public should be protected against assertions otherwise. If, on the other hand, they do possess separate curative properties, their use and so their advertising should be encouraged.

The effect of the battle on the judicial laity is well illustrated in three opinions not cited but examined by us. The first is that of United States v. Ninety-Four Dozen Bottles Capon Springs Water, supra, the second that of a distinguished Vice Chancellor of New Jersey, Bear Lithia Springs Co. v. Great Bear Spring Co., 71 N.J.Eq. 595, 71 A. 383, and the third by a Justice of the Supreme Court of the District of Columbia. It will be noticed that in the second case one litigant complains of the lack of chemical analysis. We mention that because in the case at bar the criticism is of reliance on such analysis and neglect of clinical experience. One cannot please everybody. Our own associate in the Federal Judiciary expressed this opinion: "Some of the literature put out by the claimants may be characterized as not only florid, but is almost laughable in its over statements. Every one has heard, however, of extravagant claims made by the advocates of a liberal use of ordinary drinking water. This is epitomized in the slogan 'flood your kidneys.' This has no reference to any particular drinking water, but applies to any water. All the extravagant claims made for drinking Capon Springs water are made for the liberal use of any drinking water. There is no reason to doubt that those who advocate the liberal use of drinking water honestly believe the practice to be beneficial. We are not prepared to make any finding that it is not, and we are far from finding that all the benefits claimed will be conferred. The point we have in mind to make is that the act of Congress does not interdict any one from advocating the liberal use of drinking

water nor from enforcing the advocacy of it by extravagant predictions of the benefits which will follow. If this can be done in the case of water as water, we do not see how the claimants can be interdicted from saying the same thing about Capon Springs water". United States v. Ninety-four Dozen, More or Less, Half-Gallon Bottles Capon Springs Water, D.C., 48 F. 2d 378, 380, 381.

The learned New Jersey equity judge, on the other hand, had these views:

" * * * The evidence shows, beyond doubt, that as long ago as 1893 the complainant's circular advertisements and all letterheads used by it contained the following representations referring to Bear Lithia Water: 'Nature's own remedy. Cures kidney and bladder troubles, uric acid, gout and rheumatism, phosphoric deposits, inflammation of the bladder, dropsical affections, brick dust deposits, gravel, and all forms of dyspepsia.' * * * The complainant produced some witnesses as experts who had no experience in the use of the water, but their testimony proves nothing beyond the claim that from a chemical standpoint the analysis was not inconsistent with the possibility that the water might have a beneficial effect upon the diseases it was claimed it would cure. One of the witnesses gave it as his opinion that 'its mineralization does not preclude its being of medicinal value,' and that the possibility would be enhanced if there was present a recently discovered agent, which he described as 'radio activity,' but there was no evidence that 'radio activity' was present in the water. The testimony of these experts as a display of learning is very interesting, but does not meet the question at issue, for none of the experts or physicians called by either side pretend that this water would cure any of the diseases named, except Dr. Smith, who did say that acute rheumatism, resulting from a gouty affection, might be cured by the use of a proper remedy, and that such a result might be reasonably expected from the use of this water, but that it would cure rheumatism generally he did not assert.

"The credulity of a court cannot be expected to extend beyond a reasonable limit, and when testimony is given which is opposed to common knowledge and the experience of mankind, as well as reliable medical evidence, hypothetical testimony which seeks to lead to a contrary result must be rejected as of no value. It is testimony, but not evidence. That this water will not cure the ills it is promised by the complainant that it will is in accord with the evidence in this cause and with common sense. There may have been isolated cases where the user supposed his recovery was aided, or perhaps produced, by the use of this water, for conditions may have existed in some cases which made it appear to the person benefited that it was the result of the use of this water, but that is the case with every quack medicine, as the numerous testimonials obtainable and published in such cases testify, but that this water will cure all the human ills it is advertised to do no sane person can for a moment believe". Bear Lithia Springs Co. v. Great Bear Spring Co., 71 N.J.Eq. 595, 71 A. 383, 386, 387.

So, also, this tribute from the District of Columbia: " 'For a person to obtain a therapeutic dose of lithium by drinking Buffalo Lithia Water he would have to drink from one hundred and fifty thousand to two hundred and twenty-five thousand gallons of water per day. It was further testified, without contradiction, that Potomac River water contains five times as much lithium per gallon as the water in controversy' ". Judge Gould, United States v. Buffalo Lithia Springs Water, Supreme Court District of Columbia, Feb. 16, 1914 reported in White and Gates Decisions of Courts in Cases Under the Federal Food and Drug Act (United States Department of Agriculture) 573, 575; Cramp, Nostrums and Quackery, p. 466.

■ The Commission's order is surely the most gentle exercise of its power extant. It at most compelled the petitioners to cut their advertisements to the testimony of their own physician experts. They were ordered to cease and desist from "representing directly or by implication that the use of said water alone either externally or internally will cure" 52 named diseases ranging from nephritis to chronic pneumonia (whatever that is) and from poison ivy to sterility.

Petitioners' advertising consisted in the main of a pamphlet or should we say bro-

---

1 "Lo, the poor Indian! whose untutor'd mind Sees God in clouds, or hears him in the wind; His soul proud Science never taught to stray Far as the solar walk or milky way".
Pope, Essay on Man, Epistle 1, Line 99.

cnure, which contained, first, a touching account of the lowly redskins' interest in their Cacapaon (healing) waters[1]; second, a suggestion that they are responsible for the vigor which enabled the Father of his country to assume that role; and, third, both a summary of and quotations from the opinions of a series of physicians anent the therapeutic properties of the Capon (Anglicized) Springs. These last begin in 1870 and extend to the present. They vary in intensity of praise from the mild "applicable" of Dr. William P. McGuire, former President of the Medical Society of Virginia, to the violent "cures almost everything" of Dr. R. A. F. Penrose, former Professor at the University of Pennsylvania.[2]

The present order of the Commission seems to us both inconsistent with what we know of their previous practice and open to the criticism we expressed in our recently filed opinion, Belmont Laboratories v. Federal Trade Commission, 3 Cir., 103 F.2d 538. That comment referred to the fallacy of attempting to draw a "fine line" between remedy and cure. The present order seems to us to attempt an even more attenuated distinction. Under it, a bed manufacturer might advertise his products for the "cure" of pneumonia as long as he did not exclude the use of sulfapyridine. As the error is on the side of leniency petitioners should be pleased, not piqued.

Although this may be our feeling about the order we are affirming, there does not seem to be anything we can do about it. Our function is, of course, not nisi prius, and although not strictly appellate is confined by the statute to the enforcement of or refusal to enforce the Federal Trade Commission's orders. 15 U.S.C.A. § 45 (d). In the latter aspect, as the greater includes the lesser, we may modify. We cannot, however, sponte sua do what we have not been asked to do.

Even had this not been so, we should have preferred a different record. The Commission's experts seemed rather inexperienced in the particular branch and talked a good deal about Potomac River water. Petitioners' physicians, on the other hand, appeared to gather some of their clinical experience of Capon Springs Water from trying it on their dogs, Record p. 561, and wives, Record p. 546. For the future, if there is to be a future, we might call attention to one fact and one point of law. The chemical analysis of the water offered, and although criticized not rebutted, is substantially that of the Encyclopaedia Britannica's typical analysis of Mineral Waters, Vol. 15, 14th Ed., p. 530.[3] We do not believe that the money back guarantee has any bearing on the legal philosophy of the statute. Our bodies and not our pocketbooks are being protected. To restore the cash is not to restore the health.

The order of the Federal Trade Commission is affirmed.

---

[2] We have counted these appreciative appellations and find that they appear as follows:

Cure (curative), 14; beneficial; 8; valuable, 6; remedy, 4; relieved, 3; therapeutic, 3; virtues, 2; applicable, 2; good effects, 2; radio-activity, 1; corrective, 1; indicated, 1; notable success, 1; chronic, 1; advantage, 1; restored, 1; influence, 1; improvement, 1; disappear, 1; recommends, 1; decided merit, 1; potent, 1; no equal, 1; relief, 1; wonderful, 1; solvent, 1; excelled, 1; efficacious, 1; diuretic, 1; reliable, 1.

[3] See, also, Bell, Climatology and Mineral Waters of the United States, p. 145; The Propaganda For Reform in Proprietary Medicines, Vol. 2, p. 160; Blumgarten, Textbook of Materia Medica and Therapeutics, sub nomine, Saline Purgatives, p. 218.