BROWN SHOE COMPANY, Inc., Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 17336.

United States Court of Appeals Eighth Circuit.

Dec. 8, 1964.

---

**46**

Robert H. McRoberts, Gaylord C. Burke, and Edwin S. Taylor, of Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for petitioner.

Thomas F. Howder and Gerald J. Thain, Attys., James McI. Henderson, Gen. Counsel, and J. B. Truly, Asst. Gen. Counsel, Federal Trade Commission, Washington, D. C., for respondent.

Before VOGEL, MATTHES and RIDGE, Circuit Judges.

VOGEL, Circuit Judge.

This case arises from a petition to review an order of the Federal Trade Commission directed against Brown Shoe Company, Inc. The case was originally brought by the Commission under § 5 of the Federal Trade Commission Act which provides:

"§ 5(a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." 66 Stat. 632 (1952), 15 U.S.C.A. § 45 (a) (1) (1958).

The Commission's complaint, issued October 13, 1959, alleged that Brown Shoe Company, Inc., a manufacturer and distributor of shoes, violated § 5 through the operation of its franchise stores program and by fixing the retail prices at which its products were sold by dealers.

Count 1 alleged that Brown "entered into contracts or franchises with a substantial number of its independent retail shoe store operator customers which required said customers to restrict their purchases of shoes for resale to the Brown lines and which prohibit them from purchasing, stocking or reselling shoes manufactured by competitors of Brown". It charged that dealers having this relationship with Brown are termed "Brown Franchise Stores" and are afforded special treatment and given certain benefits not granted other customers.

Among the benefits or services listed in the Commission's complaint were "free signs, business forms and accounting assistance participation in lower cost group fire, public liability, robbery, and life insurance policies; and special, below list prices on U. S. Rubber Company

canvas and waterproof footwear". In return for these services, the complaint charged that franchise dealers must "concentrate" their purchases of shoes upon "the grades and price lines" of shoes manufactured and sold by Brown. It further charged that such dealers must "refrain from stocking and selling shoes of competitors" and that dealers who violate their franchise agreement by doing so are dropped from the program and are deprived of the benefits available thereunder.

The Commission alleged that the "purpose, intent or effect" of such practices on the part of Brown was "substantially to lessen, hinder, restrain and suppress competition" in the distribution of shoes in interstate commerce and in general to "foreclose" or "exclude" competitors from a "substantial share" of the retail dealer market, thereby further enhancing the already powerful competitive position of Brown in the shoe industry.

Count 2 of the Commission's complaint charged petitioner with resale price fixing in forcing or requiring its retail dealers to "agree to maintain arbitrary, noncompetitive resale consumer prices fixed and promulgated by Brown".

In connection with Count 2, the complaint alleged that petitioner "regularly publishes and distributes" to its customers "price lists or catalog lists" containing "the consumer prices to be observed" by them and that petitioner "frequently publishes" these prices in "full page advertisements in magazines having national circulation".

The complaint charged that through its representatives and officials Brown "maintains continuous pressure" upon its dealers "to insure that they do not depart from or sell below the minimum retail prices" established. It charged that non-adherents to these prices "are immediately contacted by Brown representatives" to insure compliance by "persuasion" if possible but "if that fails, to threaten and inform" such dealers that petitioner "will discontinue doing business" with them.

The acts and practices of petitioner set forth in both counts of the complaint were alleged to constitute unfair methods of competition and unfair acts and practices in commerce within the intent and meaning of § 5 of the Federal Trade Commission Act.

Brown, through its answer, generally denied the charges in the complaint. With reference to Count 1, however, Brown admitted entering into "contracts or franchises" with approximately 259 retail dealers. In addition, it declared that there were approximately 423 dealers operating on a "Brown Franchise Program" who had not executed such written agreements.

The franchise agreement in question admittedly contained a provision stating that in return for the services and benefits described, the franchise dealers must "concentrate" their business upon products manufactured by Brown. Brown admitted that the operators of such Brown franchise stores "in individually varying degrees" accepted benefits and performed the obligations contained in such franchise agreements implicit in such program. It further admitted that in general the enumerated services and benefits are not available to those dealers "who are dropped or voluntarily withdraw" from the program.

In answer to Count 2, petitioner admitted only that it "regularly distributes to its retail shoe customers price lists or catalog sheets, certain of which contain suggested retail selling prices" and that "on occasions it publishes suggested retail selling prices in full page advertisements in magazines having national circulation".

Following extensive hearings in St. Louis, Missouri; Milwaukee, Wisconsin; Dallas, Texas; Washington, D. C.; Los Angeles and San Francisco, California; and Portland, Oregon, the Hearing Examiner issued an initial decision in which he found that the charges set forth in both counts of the complaint were sustained by the evidence, and entered an order requiring Brown to cease and desist from these practices. Brown took

exception to the Examiner's findings and petitioned the Commission for a review. Its petition was granted. After hearing the matter on briefs and oral arguments, the Commission modified a portion of the Examiner's decision to conform to its own views. As thus modified and as supplemented by its own opinion, the initial decision of the Hearing Examiner was adopted.

In modifying the initial decision, the Commission deleted therefrom the Examiner's findings as to the substantial effect of the Brown franchise program on competition and substituted therefor its own findings. It held that it was not necessary to examine the probable effect of petitioner's program upon competition in order to find that the program was an unfair trade practice violative of § 5 of the Federal Trade Commission Act, but that in any event, on the authority of Brown Shoe Co., Inc. v. United States, 1962, 370 U.S. 294,[1] 82 S.Ct. 1502, 8 L.Ed.2d 510, the prospective competitive impact of the program was such as to render it unlawful. The Commission stated:

"We have found that Brown's operation of the franchise plan constitutes an unfair trade practice violative of Section 5 of the Federal Trade Commission Act. We conclude, therefore, that Count 1 of the complaint has been sustained.

Moreover, an examination of the market facts of the shoe industry, as developed in this record in the light of the Brown Shoe decision, persuades us that the prospective competitive impact of the franchise program is such that the standards of illegality under Section 3 and Section 7 of the Clayton Act, as amended, have been met."

On May 1, 1963, Brown filed its petition to review the order of the Commission on the grounds that such order and the findings and opinion upon which it was based are arbitrary and capricious, not supported by any substantial evidence, not in accordance with law, and lacking in due process. Petitioner has asked to have the order set aside and the complaint dismissed. The findings of the Commission and the Examiner may be summarized as follows:

Petitioner, Brown Shoe Company, Inc., is a New York corporation with its office and principal place of business in St. Louis County, Missouri. It is primarily engaged in the manufacture and distribution of nationally advertised medium-priced men's, women's and children's shoes. Brown and its subsidiaries operate over 50 manufacturing, supply and service plants located throughout the United States and Canada. In 1959, this complex ranked third in shoe pairage production among the country's approxi-

[1]. Therein the United States brought suit to enjoin consummation of a merger of two corporations (Brown Shoe Company, Inc., the petitioner herein, and the G. R. Kinney Company, Inc., eighth largest retailer of shoes) on the ground that its effect might be to substantially lessen competition or tend to create a monopoly in the production, distribution and sale of shoes in violation of § 7 of the Clayton Act, as amended 1950. The District Court had found that the merger would increase concentration in the shoe industry, both in manufacturing and retailing, eliminate one of the corporations as a substantial competitor in the retail field, and establish a manufacturer-retailer relationship which would deprive all but the top firms in the industry of a fair opportunity to compete and that therefore it probably would result in a fairly substantial lessening of competition and an increased tendency toward monopoly. In affirming the District Court, the Supreme Court said at page 346 of 370 U.S., at page 1535 of 82 S.Ct.:

"We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency, particularly when those tendencies are being accelerated through giant steps striding across a hundred cities at a time. In the light of the trends in this industry we agree with the Government and the court below that this is an appropriate place at which to call a halt."

mately 900 to 1,000 shoe manufacturers. These manufacturers produced 632 million pairs of leather shoes in 1959.

The shoes manufactured by Brown and its subsidiaries are marketed on a nation-wide basis, primarily through sales at wholesale to independent retail customers, including individual shoe stores, chain stores, department stores and specialty stores. Apart from its subsidiaries, Brown was selling to approximately 6,000 retail customers at the time the complaint was issued.

Brown was second in dollar sales and third in pairage production in the shoe industry in 1958 and 1959.[2] Although total dollar sales for the fiscal year ending October 31, 1959, were $276,549,164,[3] this figure included sales at wholesale and at retail by Brown and its subsidiaries and included inter-company sales as well. Brown's sales at wholesale for the same period to its 6,000 independent retail shoe store customers were $111,-292,872. That same year (1959) the top 70 shoe manufacturing firms in the industry had total dollar sales of 1.8 billion dollars.

Brown maintains an extensive distribution system. It is organized into separate selling divisions through which it markets its various brands of shoes to its retail customers.

The division of Brown which is of paramount importance under Count 1 of the complaint is the franchise stores division. The personnel of this division include a manager, two assistants and 16 salaried "field men" who travel in assigned territories servicing various franchise accounts. The franchise division manager is responsible to the vice president in charge of sales.

Petitioner's franchise stores program has been in operation for approximately 30 years. More recently the number of dealers under this program has increased. In November 1959 there were 682 retailers in the system. By October 1961, at the conclusion of reception of evidence herein, the number of franchisees had increased to about 767.

Petitioner makes no distinction between dealers having written franchise agreements with it and those who do not insofar as any benefits or obligations under the program are concerned. In November 1957 petitioner had written franchise agreements with approximately 260 dealers.

The Brown franchise agreement requires that the retail dealer—*in return* for various enumerated services and benefits—must:

"* * * concentrate my business within the grades and price lines of shoes representing Brown Shoe Company Franchises of the Brown Division and will have no lines conflicting with Brown Division Brands of the Brown Shoe Company."

Several valuable benefits and services are afforded franchise holders. Specifically mentioned in the franchise agreement are: The services of field representatives; the use of merchandising forms and records; retail sales training programs; accounting system installation; group purchasing of insurance, rubber footwear and display materials;

**2.** This included the dollar sales and pairage production of G. R. Kinney Corporation, at that time a wholly-owned subsidiary of Brown operated as a separate business by court order. Brown has since divested itself of Kinney, pursuant to court order. In 1957 Kinney's net sales while a subsidiary of Brown were $62,000,000. If Kinney's sales (and any reasonable pairage production estimate) are subtracted from the figures shown for the top seventy shoe manufacturers, Brown would be third in dollar sales and fourth in pairage produced for 1958 and 1959. Brown Shoe, supra.

**3.** Includes sales by G. R. Kinney Corporation. Kinney was formerly an independently operated company. At the time of the hearings it was a wholly-owned subsidiary of Brown. Subsequently, petitioner's merger with this company was declared illegal under § 7 of the Clayton Act, the anti-merger provision, 64 Stat. 1125 (1950), 15 U.S.C.A. § 18 (1958), and petitioner was ordered to divest itself of Kinney. Brown Shoe, supra.

and the opportunity to participate in national and regional sales meetings.

The Commission found that the "prime motivation" of dealers in joining and continuing on the franchise program was the above-described benefits and services available to them. The Commission recognized that not every dealer utilized each benefit, but found that "collectively" these benefits achieved the intended effect; viz., attracting selected retailers to the program and inducing them to comply with its restrictive requirements.

The Commission found that these requirements as set forth in the franchise agreement were applicable to "signer and non-signer franchise holders alike"; that this agreement not only "on its face" restricted competitive purchasing of franchise dealers, but that petitioner's field men actively policed dealers to insure their concentration upon Brown lines and elimination of competing products; that franchise dealers who persisted in carrying conflicting lines were separated from the program.

The Commission found that although franchise dealers theoretically may be free to quit the program and return to their former status, the record on the whole showed that the relationship between Brown and its franchise dealers was "reasonably stable". The Commission likewise took into account evidence showing that franchise dealers sometimes handled certain types and quantities of competitive shoes. It held that such evidence did not vitiate its finding that competitors were foreclosed from selling to franchise dealers in substantial amounts and that other evidence of record established this. (The record indicates that Brown franchise dealers purchase approximately 25% of their shoes from other manufacturers. A part of this 25% was made up of lines in competition with Brown.)

In sum, the Commission held that petitioner's operation of its franchise program, which it found effectively foreclosed competitors from making substantial sales to a significant number of de-sirable retail outlets, constituted an unfair trade practice in violation of § 5 of the Federal Trade Commission Act. The Commission further found that petitioner's practice of conditioning the above-described benefits of membership in the program upon adherence to the restrictive terms of the franchise agreement was "akin to the operation of tying clauses generally held as inherently anti-competitive". In addition, the Commission, after examining the various economic factors in the shoe industry, was persuaded " * * * that the prospective competitive impact of the franchise program is such that the standards of illegality under Section 3 and Section 7 of the Clayton Act, as amended, have been met."

As to Count 2 of the complaint, the Commission found that petitioner entered into agreements with its retail dealers that its suggested retail prices would be followed and that it attempted to enforce and had in fact effectuated compliance with such agreements. The Commission found that Brown communicates the prices it establishes in "various ways". Most of Brown's selling divisions furnish their salesmen and customers with price lists containing a retail price "suggested" by petitioner. The Commission further found that advertising is another method used by petitioner to establish retail prices. On the whole, the Commission's evidence relating to Count 2 of the complaint concerns transactions with two of Brown's franchise stores and their pricing policies.

When this case was first instituted on October 13, 1959, it obviously was the theory of the Federal Trade Commission that Brown's franchise stores program was an unlawful exclusive dealing arrangement violative of § 5 of the Act. It was so found by the Hearing Examiner and decided by him on that basis. The Commission struck such findings of the Examiner, stating:

"In short, from our review of the record, we find that respondent's operation of the franchise plan, which has effectively foreclosed its com-

petitors from selling to a significant number of retail shoe stores, constitutes an unfair trade practice under Section 5 of the Federal Trade Commission Act. Respondent's practice of conditioning the benefits of membership in the plan to adherence to the restrictive terms of the franchise agreement for the purpose of foreclosing other manufacturers from selling to its franchisees is akin to the operation of tying clauses generally held as inherently anti-competitive."

■ A proceeding under § 5 of the Federal Trade Commission Act is not one brought before the Commission by one party against another. It is instituted by the Commission itself and may be commenced whenever the Commission has reason to believe that "unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce * * *" have been used by the party against whom it proceeds.

" * * * The object of the Trade Commission Act was to stop in their incipiency those methods of competition which fall within the meaning of the word 'unfair.' 'The great purpose of both statutes was to advance the public interest by securing fair opportunity for the play of the contending forces ordinarily engendered by an honest desire for gain.' Federal Trade Comm. v. Sinclair Co., 261 U.S. 463, 476, 43 S.Ct. 450, 454, 67 L.Ed. 746. All three statutes [the Sherman Anti-Trust Act, the Clayton Act and the Federal Trade Commission Act] seek to protect the public from abuses arising in the course of competitive interstate and foreign trade." Federal Trade Commission v. Raladam Co., 1931, 283 U.S. 643, 647, 51 S.Ct. 587, 589–590, 75 L.Ed. 1324.

Our primary question is whether there was adequate evidentiary basis for the Commission's finding that the Brown franchise program was an unfair method of competition and accordingly unlawful under § 5 of the Act. The Act itself provides, 15 U.S.C.A. § 45(c) " * * * [t]he findings of the Commission as to the facts, if supported by evidence, shall be conclusive." The use of identical language with reference to the findings of the National Labor Relations Board under the Wagner Act caused the Supreme Court to say in Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 464–465, 95 L.Ed. 456:

" * * * The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. * * *

"To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

With reference to what is "unfair" within the purview of § 5 of the Act, the Supreme Court has said in Federal Trade

Commission v. Gratz, 1920, 253 U.S. 421, 427, 40 S.Ct. 572, 575, 64 L.Ed. 993:

> "The words 'unfair method of competition' are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine as a matter of law what they include. *They are clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud, or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly.* The act was certainly not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade." (Emphasis supplied.)

And in Federal Trade Commission v. Raladam Co., supra, 1931, 283 U.S. 643, 648, 51 S.Ct. 587, 75 L.Ed. 1324:

> " * * * It [the words 'unfair methods of competition'] belongs to that class of phrases which does not admit of precise definition, but the meaning and application of which must be arrived at by what this court elsewhere has called 'the gradual process of judicial inclusion and exclusion.' Davidson v. New Orleans, 96 U.S. 97, 104, 24 L.Ed. 616. The question is one for the final determination of the courts and not of the Commission. Federal Trade Comm. v. Gratz, 253 U.S. 421, 427, 40 S.Ct. 572, 64 L.Ed. 993; Federal Trade Comm. v. Beech-Nut Co., supra, p. 453 of 257 U.S., 42 S.Ct. 150.

Our question here is whether Brown's program could possibly be classified as an "unfair method of competition". What Brown did in the operation of its Brown franchise stores program it had been doing for at least thirty years prior to the institution of this proceeding. Similar programs are operated by its competitors, such as International Shoe Company's Merchants Service Plan and General Shoe Company's General Shoes Friendly Franchise Store Plan.[4] No court has gone so far as to hold like programs or methods of doing business unlawful under § 5 of the Federal Trade Commission Act and such programs or sales methods have never heretofore been " * * * regarded as opposed to good morals because characterized by deception, bad faith, fraud, or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly." 253 U.S. at page 427, 40 S.Ct. at page 575.

The Commission would liken Brown's program to "tying arrangements", relying on Northern Pacific Railway Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545, and other cases. Northern Pacific is factually distinguishable. The railway company there possessed a monopoly of some 40,000,000 acres of land along the route of its railroad line from Lake Superior to Puget Sound. The company tied the sale or lease of its land to the use of its hauling services by inserting "preferential routing" clauses in its contracts for sale and leases which compelled the buyer or lessee to ship over Northern Pacific's lines all commodities produced or manufactured on the land provided its rates were equal to those of competing carriers. The railway used its great economic power provided by the land to enforce the use of its transportation facilities.

Analyzing what Brown Shoe Company did in the instant case insofar as its Brown franchise stores program is concerned, we find:

1. It made agreements, some in writing but more orally, in which it agreed to furnish certain services to those of its customers who would "concentrate"

---

4. As of 1961 International Shoe had some 1,400 independent retailers under its Merchants Service Plan; while some 317 shoe retailers were members of General Shoe's Friendly Franchise Store Plan.

their business on shoes manufactured by Brown.

2. The services were free of charge with the exception of the fact that Brown's four seasonal window display props for two windows cost $500 to $600 per year and were available as well to other independent retail shoe store customers of Brown.

3. Brown did not have a monopoly on the services which constituted the tying product nor did it have a monopoly on the tied product—shoes.

4. Brown's competitors also furnished services in connection with the sale of their shoes.

5. Retailers were free to abandon the arrangement at any time they saw it to their advantage so to do.

6. Most of the services were available to customers who did not join in the Brown franchise program.

The Commission draws a parallel between the effect of the sale or lease by the railroad of its land in Northern Pacific with Brown's giving its services to the participants of Brown's franchise stores program, thus forcing them to buy Brown's shoes.[5]

We find no comparability between Brown's situation and that which existed in Northern Pacific. The Supreme Court, in holding the tying arrangement in Northern Pacific as being unlawful per se, stated at page 5 of 356 U.S.; at page 518–519 of 78 S.Ct.:

"* * * Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, 60 S.Ct. 811, 838, 84 L.Ed. 1129; division of markets, United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 46 L.R.A. 122, affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; group boycotts, Fashion Originators' Guild of America v. Federal Trade Comm., 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; and tying arrangements, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20.

"For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed 'tying agreements serve hardly any purpose beyond the suppression of competition.' Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons 'tying agreements fare harshly under the laws forbidding restraints of trade.' Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 606, 73 S.Ct. 872, 879, 97 L.Ed. 1277. They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed.

5. The Commission states in its brief: "In this, it resembles the converse of the situation presented in Northern Pacific, where the railroad's freight *services*

were 'tied' to the use of its *products* (the valuable lands involved). 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)."

20. Cf. United States v. Paramount Pictures, 334 U.S. 131, 156–159, 68 S.Ct. 915, 928–929, 92 L.Ed. 1260; United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236. *Of course where the seller has no control or dominance over the tying product [franchise services] so that it does not represent an effectual weapon to pressure buyers into taking the tied item [shoes] any restraint of trade attributable to such tying arrangements would obviously be insignificant at most.* As a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself." (Emphasis supplied.)

Holding at page 7 of 356 U.S., at page 519 of 78 S.Ct., that

" * * * the undisputed facts established beyond any genuine question that the defendant possessed substantial economic power by virtue of its extensive land holdings which it used as leverage to induce large numbers of purchasers and lessees to give it preference, to the exclusion of its competitors, in carrying goods or produce from the land transferred to them. Nor can there be any real doubt that a 'not insubstantial' amount of interstate commerce was and is affected by these restrictive provisions."

the court goes on to say at page 11 of 356 U.S., at page 521 of 78 S.Ct.:

" * * * the vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another, regardless of the source from which the power is derived and whether the power takes the form of a monopoly or not."

While it is clear that a "not insubstantial" amount of interstate commerce is involved here, that fact alone does not make petitioner's program an "unfair" method of competition nor may the selling activities of petitioner be described as "deceptive acts or practices". In Brown there was no "sale" of the *tying* product (franchise services); there is no evidence that Brown's "power or leverage" in the tying product was such as to force the purchase of the "tied products" (shoes). This case presents a situation where the seller, Brown, has no control or dominance over the tying product, services; consequently, the Brown franchise program is not an "effectual weapon" to pressure buyers into taking the tied item, shoes.

If the free services which Brown Shoe Company gives its customers who buy its shoes under its Brown franchise program can be found to be unlawful under § 5 of the Act, then the next logical step would be to hold unlawful an agreement by a manufacturer or distributor to advertise its products in fixed areas if retailers therein would agree to stock and to sell them.

We likewise find no comparability between the facts with which we are here concerned and United States v. Loew's, Inc., 1962, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11, wherein the Supreme Court adopts the trial court's apt example of " * * * forcing a television station which wants 'Gone With The Wind' to take 'Getting Gertie's Garter' as well as taking undue advantage of the fact that to television as well as motion picture viewers there is but one 'Gone With The Wind.'" There is more than one source from which the Brown franchise dealers can obtain the services complained about. Brown had no monopoly on services performed under the franchise program. Other manufacturers can and do render like services.

Nor do we find United States v. Jerrold Electronics, Inc., E.D.Pa., 1960, 187 F.Supp. 545, affirmed by the Supreme Court on the basis of Northern Pacific, International Salt, etc., at 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806, comparable to the facts with which we are here

concerned. In Jerrold the trial court said at page 555 of 187 F.Supp.:

"* * * Jerrold's highly specialized head end equipment was the only equipment available which was designed to meet all of the varying problems arising at the antenna site. It was thus in great demand by system operators. This placed Jerrold in a strategic position and gave it the leverage necessary to persuade customers to agree to its service contracts. This leverage constitutes 'economic power' sufficient to invoke the doctrine of *per se* unreasonableness."

There is no parallel between the facts present in Jerrold and those presented here. Brown's franchise program was not the only program available to retailers. It did not give Brown the economic leverage to force the sale of its shoes. The tying product in Jerrold was highly specialized equipment which was in great demand. There is nothing specialized or unique about the services offered by Brown.

The Commission alternatively relies on Brown Shoe Co., Inc. v. United States, supra, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510, as persuading it "* * * that the prospective competitive impact of the franchise program is such that the standards of illegality under Section 3 and Section 7 of the Clayton Act, as amended, have been met." We cannot agree. That case tested the illegality of Brown's acquisition of Kinney through a merger of the corporations and found that the vertical arrangements were illegal under §§ 3 and 7 of the Clayton Act. We find it utterly unpersuasive here. Brown has not "acquired" the retail outlets of those who join its program. The latter are free to leave it at any time. The only similarity between this case and the previous Brown Shoe Co. decision, supra, is the fact that the same corporation is involved in both disputes.

This case can be likened to Timken Roller Bearing Co. v. F. T. C., 6 Cir., 1962, 299 F.2d 839, certiorari denied, 371 U.S. 861, 83 S.Ct. 118, 9 L.Ed.2d 99. There Timken was found by the Federal Trade Commission to be in violation of § 3 of the Clayton Act, 15 U.S.C.A. § 14, by following a consistent policy of "exclusive dealing". The court, in setting aside the Commission's order and findings, said beginning at page 840 of 299 F.2d:

"In support of the accusations contained in the Complaint, the Commission introduced in evidence numerous documents purporting to prove Timken's consistent policy of exclusive dealing. The majority of these documents consisted of salesmen's reports to the Timken home office, recommending the taking on of a new account or the canceling of an old one. In our view, the Commission's whole case rests upon the fact that, in these reports, the salesmen either recommended Timken's taking on a new account because it would be 'loyal' to that company, or suggested that an old account be cancelled because the dealer was stocking the products of a Timken competitor.

* * * * * *

"* * * Nor can the documents alone be substantial evidence of such a policy, inasmuch as, even if these reports show that Timken cancelled dealers' accounts because they were dealing in competitive bearings, this alone is not illegal. Perhaps the rule has best been stated for our purposes in the following language: 'The anti-trust laws do not prohibit a manufacturer or distributor from selecting dealers who will devote their time and energies to selling the former's products and a manufacturer is not compelled to retain dealers having divided loyalties adverse to the interests of the said manufacturer or distributor.' McElhenny Co., Inc. v. Western Auto Supply Co., 167 F.Supp. 949, at page 954, affirmed 269 F.2d 332 (C.A.4).

"A seller has the right to select his own customers. This right is protected by the Clayton Act, itself. 15 U.S.C.A., § 13. The right has been recognized by the authorities, even where it was not expressly provided for by the statute. United States v. Colgate & Company, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992; Times-Picayune Publishing Company v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277; Naifeh v. Ronson Art Metal Works, 218 F.2d 202 (C.A.10). To uphold the order entered by the Commission in this case would be, in effect, to destroy this right."

■ By passage of the Federal Trade Commission Act, particularly § 5 thereof, we do not believe that Congress meant to prohibit or limit sales programs such as Brown Shoe engaged in in this case. No monopoly of either services or shoes could be established. The custom of giving free service to those who will buy their shoes is widespread, and we cannot agree with the Commission that it is an unfair method of competition in commerce. The more and better service that Brown gave to its customers, the more it strengthened their "loyalty" to Brown Shoe. The fact that Brown franchise dealers were successful, having an average return of 16% against an average return of other independent shoe dealers in America of 11.8% certainly does not operate against the legality of the program. We hold that the Brown franchise stores program was not an unlawful tying arrangement and that there was a complete failure to prove an exclusive dealing agreement which might be held violative of § 5 of the Act.

■ With reference to Count 2, it is the contention of the Commission that there was substantial evidence in the record to support its finding that the petitioner engaged in unlawful resale price maintenance. Evidence on this count involves only 2 of approximately 6,000 independent shoe retail customers of Brown —Fraver's Shoe Store of Chambersburg, Pennsylvania, and Pomeroy's Department Store in Harrisburg, Pennsylvania. The Fraver incident is very much disputed and is based upon an unauthorized letter never used. The Pomeroy incident is based entirely on disputed testimony, by far the greater weight of which favored petitioner's contention, not the findings and inference of the Commission. Even under this court's limited scope of review, Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456, we are of the opinion that the findings and conclusions of the Commission and the order based upon them must be set aside as not supported by substantial evidence on the record considered as a whole.

The order and opinion of the Commission are set aside and the Commission's complaint and each count thereof ordered dismissed.